O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL SHEETS,<br><br>                 Plaintiff,<br><br>     v.<br><br>ADMINISTRATIVE COMMITTEE OF THE NORTHROP GRUMMAN SPACE & MISSION SYSTEMS CORP. SALARIED PENSION PLAN, et al.,<br><br>                 Defendants. | Case No.: 2:22-cv-07607-MEMF (PDx)<br><br>**ORDER DENYING PLAINTIFF MICHAEL SHEETS'S MOTION FOR DEFAULT JUDGMENT [ECF NO. 22]** |

      Before the Court is the Motion for Default Judgment filed by Plaintiff Michael Sheets. ECF No. 22. For the reasons stated herein, the Court DENIES the Motion for Default Judgment.

**I.      Factual Background[1]**

      Plaintiff Michael Sheets ("Sheets") is resident of Castle Rock, Colorado. Declaration of Michael Sheets, ECF No. 22-7 ("Sheets Decl.") ¶ 1. Defendant Northrop Grumman Corporation ("Northrop Grumman") is a corporation headquartered in Falls Church, Virginia. Compl. at 3.[2] The

---

[1] Unless otherwise indicated, the following facts are derived from the Complaint. ECF No. 1 ("Compl.").
[2] The paragraph numbers in the Complaint appear to reset after paragraph number 37. *See* Compl. at 10. To minimize confusion, the Court's pincites refer to the Complaint's page numbers.

1

Administrative Committee of the Northrop Grumman Space & Mission Systems Corporation Salaried Pension Plan (the "Committee") is the pension benefits dispensing arm of Northrop Grumman (collectively, the "Northrop Grumman Defendants"). *Id.* at 3.

Sheets is a former employee of TRW, Inc. ("TRW"), where he was employed from 1974 to 1979. *Id.* at 1; Sheets Decl. ¶¶ 2–3. As a result of his employment at TRW, Sheets acquired a vested pension benefit with the corporation. *Id.* Sheets later transitioned to the Boeing Company ("Boeing"), where he remained for twenty-eight years. Compl. at 1. TRW was acquired by Northrop Grumman some time after Sheets left TRW. *Id.* Through the course of the acquisition, Northrop Grumman assumed all liabilities for TRW's pension benefits. *Id.*

After working for several years, Sheets began to look towards retirement. *Id.* He contacted a representative from the Committee, who informed him that his pension benefit would be determined by the "average annual salary of his five highest grossing years." *Id.* He was further informed that if he were found to have worked for Northrop Grumman, any salary that he earned during the course of his tenure would be "bridged"; meaning that his salary at Northrop Grumman would contribute to the average and ultimately result in a higher monthly payout. *Id.* at 1, 4.

As a result of these representations, in 2007, Sheets elected to leave Boeing for Northrop Grumman at its office located in Redondo Beach, California. *Id.* at 5. Sheets's key motivation for the transition was to receive a higher pension benefit. *Id.* at 1, 5. The promise of the "bridging" of benefits is the sole reason why Sheets elected to leave Boeing. *Id.* at 6. During the course of the Northrop Grumman hiring process, company representatives provided the same guidance: that Sheets's pension benefit would *increase* as a result of his subsequent time with Northrop Grumman. *Id.* When Sheets began working at Northrop Grumman in 2008, he received written confirmation of the same. *Id.* at 5.

At the start of his tenure at Northrop Grumman, Sheets, relying on advice provided by the Committee and Northrop Grumman itself, accepted a lumpsum buyout of the pension benefits he had accrued from Boeing. *Id.* Sheets transferred this payment into an individual retirement account ("IRA"). *Id.*

However, soon after arriving at Northrop Grumman, Sheets cross-checked the employee benefits information on the Northrop Grumman benefits website ("Benefits Website"). *Id.* The website did not reflect the bridging scheme. *Id.* at 5–6. Sheets contacted the Northrop Grumman Human Resources Department to inquire about the discrepancy. *Id.* at 5. He was informed that his benefits would indeed bridge due to his previous tenure with TRW. *Id.* at 6. Sheets continued to monitor the Benefits Website over the next five years. *Id.* at 7. The Benefits Website reflected that his monthly pension benefits regularly increased over time. *Id.*

Sheets provided this information to his financial advisor, who—using the information provided by Northrop Grumman, Plan representatives, and the Benefits Website—determined that Sheets would be able to retire in 2013. *Id.* at 7.

As a result, Sheets retired from Northrop Grumman in late 2013. *Id.* In 2014, pursuant to the Plan, Sheets began receiving pension benefits in the amount of $1,054.29 per month. *Id.* This amount included the pension increase as a result of Sheets's subsequent employment at Northrop Grumman. *Id.*

However, in September 2021, after consistently receiving benefits for eight years, Sheets received a letter from Northrop Grumman stating that an internal audit determined that Sheets's previous benefit allowance had been in error. *Id.* at 7. Rather than be entitled to $1,054.29 monthly, Sheets should have only received $484.13. *Id.* As a result, the letter stated that Sheets must pay $52,299.28 in overpayment. *Id.* at 7. The letter further stated that Sheets was not entitled to a bridging of his benefits. *Id.*

Sheets prepared a memorandum ("Memo") to the Northrop Grumman Human Resources Director which "explained that [Sheets] would not have started working for [Northrop Grumman] but for the Committee's and [Northrop Grumman's] representations that his time would "bridge" and that his original TRW pension would grow significantly." *Id.* The Memo also explained that Sheets's own calculations reflected that Sheets had been underpaid by $281.16 a month. *Id.* The Committee treated the Memo as a claim letter and reversed course. *Id.* at 8. In a March 21, 2022 letter ("March 21 Letter"), the Committee communicated that Sheets was no longer responsible for the alleged overpayment, but insisted that the Plan did not entitle Sheets to bridging under its terms.

*Id.* at 8. The letter did not address Sheets's argument that he had been underpaid. *Id.* The March 21 Letter stated, in relevant part

> Periodically we audit payments to ensure the proper amounts are being paid. When your account was reviewed, it was determined that the payments issued to you from May 1, 2014, through October 1, 2021, were overstated. The NGBC sent you a notice to this effect on September 15, 2021 (Exhibit A). The notice stated effective November 1, 2021, you would no longer receive the $1,063.79 monthly annuity. Instead, you would receive your monthly annuity of $484.13 under the 100% Joint and Survivor form of payment. In addition, the notice stated the recalculation of your benefit resulted in an overpayment of $52,299.28, which must be returned to the Plan.
> Your monthly NG Space & Mission System Heritage (Part A) Benefit of $58.29 was frozen when you terminated on June 1, 1979. When you rehired on February 4, 2008, you began accruing benefits under the Cash Balance (Part D) Benefit. Due to an administrative error, your Part A Benefit erroneously included earnings earned after you rehired in 2008, which was also being counted under the Cash Balance (Part D) Benefit. See Exhibit B for corrected calculation detail.
> Since you were not eligible to accrue Part A Benefits following your rehire in February 2008, your benefit under this source was overstated by $574.91 per month since May 1, 2014. Your total monthly benefit as of your original benefit commencement date should have been $479.38 and not $1,054.29 prior to Cost-of living Adjustments (COLA). The table below shows the amounts owed vs. the amounts paid for both the Part A and Part D benefits.

*Id.* at 8–9.

The March 21 Letter also stated that Northrop Grumman had incorrectly applied the Cost of Living Adjustment ("COLA") and, as a result, Sheets should not have become eligible for the adjustment until January 1, 2017. *Id.* at 9.

Sheets updated the Memo upon receipt of the March 21 Letter and—along with a comprehensive letter and a "variety of documents, including a copy of the emails to and from [Northrop Grumman's Human Resources Department representatives] that confirmed the bridging of Sheets's pension benefits" —submitted an appeal of the March 21 Letter (the "Appeal"). *Id.* at 9. As part of the Appeal, Sheets made it explicit that he would not have left his position at Boeing for Northrop Grumman but for the representations that his pension benefits would bridge. *Id.* at 9–10. Sheets further noted that at no point prior to joining Northrop Grumman had he been provided with the opportunity to review the Plan documents that indicated that he may not be eligible for the bridging benefits. *Id.* at 10.

The Committee denied the Appeal via a letter dated July 21, 2022 (the "Denial"), insisting that the Plan's plain language indicated that the original assessment was correct. *Id.* at 10. The Denial also indicated that Sheets had completed the administrative process and was now entitled to sue under the Employee Retirement Income Security Act, 29 U.S.C. § 1001, *et seq*. ("ERISA") *Id.* at 11.

The instant ERISA action is the result of these events.

## II. Procedural History

Sheets filed the Complaint on October 18, 2022 alleging six causes of action: (1) recovery of benefits, attorneys' fees and pre-judgment and post-judgment interest; (2) breach of fiduciary duty, equitable relief (including waiver, estoppel and surcharge), declaratory relief, and attorneys' fees and prejudgment interest under an ERISA Plan, 29 U.S.C. § 1132(a)(3)(B), (g)(1); (3) statutory fees for failure to provide a copy of the administrative file; (4) negligent misrepresentation; (5) fraudulent misrepresentations; and (6) unjust enrichment. *See generally* Compl. Sheets appropriately filed proofs of service on both defendants. *See* ECF Nos. 15, 16. After each defendant failed to respond, Sheets filed Requests for the Clerk to enter default judgment on each defendant. *See* ECF Nos. 17, 19. Each request was granted pursuant to Federal Rule of Civil Procedure 55(a). ECF Nos. 18, 20.

On February 7, 2023, Sheets filed the instant Application for Default Judgment against all defendants. ECF No. 22 ("Application" or "App."). On March 31, 2023, the Court deemed this matter appropriate for resolution without oral argument and vacated the hearing. ECF No. 26; *see also* C.D. Cal. L.R. 7-15.

## III. Applicable Law

### A. Default Judgment

Federal Rule of Civil Procedure 55(b) authorizes a district court to grant default judgment after the Clerk of the Court enters default under Rule 55(a). Fed. R. Civ. P. 55(b). Local Rule 55-1 requires the party seeking default judgment to file a declaration establishing: (1) when and against what party the default was entered; (2) the pleading on which default was entered; (3) whether the defaulting party is an infant or incompetent person, and if so, whether that person is represented by a general guardian, committee, conservator, or other like fiduciary who has appeared; (4) that the

Servicemembers Civil Relief Act does not apply; and (5) that the defaulting party was properly served with notice. C.D. Cal. L.R. 55-1.

Once default has been entered, the well-pleaded factual allegations in the complaint, except those concerning damages, are deemed admitted by the non-responding party. *See* FED. R. CIV. P. 8(b)(6); *TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917–18 (9th Cir. 1987). However, default judgment is not automatic upon the Clerk's entry of default; rather, it is left to the sound discretion of the court. *Aldabe v. Aldabe*, 616 F.2d 1089, 1092–93 (9th Cir. 1980). When deciding whether to enter default judgment, courts consider seven factors, commonly known as the *Eitel* factors:

> (1) the possibility of prejudice to the plaintiff; (2) the merits of plaintiff's substantive claim; (3) the sufficiency of the complaint; (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect; and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

*Eitel v. McCool*, 782 F.2d 1470, 1471–72 (9th Cir. 1986).

"Well-pleaded allegations" require "sufficient factual matter . . . to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). It requires "more than a sheer possibility that a defendant has acted unlawfully" but does not require "detailed factual allegations." *Id.* Instead, the plaintiff need only show more than "threadbare recitals of the elements of a cause of action." *Id.* "Determining whether a complaint states a plausible claim for relief is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Ebner v. Fresh, Inc.*, 838 F.3d 958, 963 (9th Cir. 2016) (quoting *Iqbal*, 556 U.S. at 679).

### B. Evaluation of subject matter jurisdiction

Courts sitting within the Ninth Circuit have an obligation on a Motion for Default Judgment to confirm that the court has subject matter jurisdiction over the instant case. *In re Tuli*, 172 F.3d 707, 712 (9th Cir. 1999). There are two ways in which a case may be heard in federal court: 1) federal question jurisdiction, 28 U.S.C. § 1331, or 2) diversity jurisdiction, 28 U.S.C. § 1332.

/ / /

/ / /

### C. Evaluation of personal jurisdiction

"When entry of judgment is sought against a party who has failed to plead or otherwise defend, a district court has an *affirmative duty* to look into its jurisdiction over both the subject matter *and the parties*." *Tuli*, 172 F.3d at 712 (emphasis added). This prevents the district court from "entering a default judgment that can later be successfully attacked as void." *Id.* And although the district court has an obligation to determine whether jurisdiction is proper, *see Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 801 (9th Cir. 2004), it is the *plaintiff's* obligation to establish that the Court has personal jurisdiction over a defendant. *See Mattel, Inc. v. Greiner & Hausser GmbH*, 354 F.3d 857, 862 (9th Cir. 2003) (holding that the plaintiff "bears the burden of establishing the district court's personal jurisdiction over the Defendants"); FED. R. CIV. P. 8(a)(1) ("A pleading that states a claim for relief must contain [. . .] a short and plain statement of the grounds for the court's jurisdiction . . . .").

"For a court to exercise personal jurisdiction over a nonresident defendant, that defendant must have at least 'minimum contacts' with the relevant forum such that the exercise of jurisdiction 'does not offend traditional notions of fair play and substantial justice.'" *Schwarzenegger*, 374 F.3d at 801 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks omitted)). Under the minimum contacts test, jurisdiction can be either general or specific. *Id.*

## IV. Discussion

### A. The Court has subject matter jurisdiction over this action.

The Court first considers whether it has subject matter jurisdiction over this action. Upon evaluation of the claims, it is clear that federal question jurisdiction applies. This action is brought pursuant to sections 502(e)–(f) of ERISA. The additional state law claims are subject to supplemental jurisdiction, 28 U.S.C. § 1367, as they are derived from Sheets's ERISA claim.

The Court thus has subject matter jurisdiction over this action.

### B. Sheets has failed to establish that this Court has personal jurisdiction over the Northrop Grumman Defendants.

The Court next considers whether it has personal jurisdiction over the Northrop Grumman Defendants. Corporations are subject to general jurisdiction "only where continuous corporate

operations within a state [are] thought so substantial and of such a nature as to justify suit against [the defendant] on causes of action arising from dealings entirely distinct from those activities." *Tuazon v. R.J. Reynolds Tobacco Co.*, 433 F.3d 1163, 1169 (9th Cir. 2006) (quotation marks omitted) (emphasis added) (citing *Int'l Shoe Co.*, 326 U.S. at 318). Thus, "[t]he standard for general jurisdiction is high; contacts with a state must 'approximate physical presence,'" such that the "defendant must not only step through the door, it must also [sit] down and [make] itself at home." *Id.* (citing *Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*, 284 F.3d 1114, 1125 (9th Cir. 2002)); *see also Mavrix Photo*, 647 F.3d at 1224 ("To determine whether a nonresident defendant's contacts are sufficiently substantial, continuous, and systematic, we consider their '[l]ongevity, continuity, volume, economic impact, physical presence, and integration into the state's regulatory or economic markets.'" (citing *Tuazon*, 433 F.3d at 1172)). A defendant corporation is subject to general jurisdiction in the forum state if it is adjudged to be domiciled in that forum. *See J. McIntyre Mach., Ltd. V. Nicastro*, 564 U.S. 873, 880 (2011). A corporation is deemed domiciled where it is incorporated or has its principal place of business. *See id.* ("Citizenship or domicile—or, by analogy, incorporation or principal place of business for corporations—also indicates general submission to a State's powers.").

Here, the Complaint merely states that Northrop Grumman is headquartered in Falls Church, Virginia. Compl. ¶ 7. It contains no allegations regarding the domicile of the Committee. *See generally* Compl. There are no allegations indicating that either defendant may be domiciled in California or otherwise has substantial, continuous, and systematic contacts with California. Accordingly, the Court does not find that it has general jurisdiction over the Northrop Grumman Defendants.

However, even if a defendant has not had continuous and systematic contacts with the state sufficient to confer general jurisdiction, a court may exercise specific jurisdiction over the defendant. *Picot v. Weston*, 780 F.3d 1206, 1211 (9th Cir. 2015). Specific jurisdiction exists where the claim for relief arises directly from a defendant's contacts with the forum state. *AT&T Co. v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 588 (9th Cir. 1996). For a court to exercise specific jurisdiction over a defendant:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; *or* perform some act by which he purposefully avails himself of the privileges of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Picot*, 780 F.3d at 1211.

Here, the allegations in the Complaint do not establish that the Court has personal jurisdiction over the Northrop Grumman Defendants. First, the Complaint does not include a "short and plain statement" outlining the grounds for the court's jurisdiction. FED. R. CIV. P. 8(a)(1). Instead, the Complaint contains a brief mention of this Court's grounds for subject matter jurisdiction, *see* Compl. ¶ 4, but does not contain a statement directly addressing whether the Northrop Grumman Defendants are subject to personal jurisdiction in this forum. The closest Sheets comes to such a statement is in paragraphs 5 through 7, where he states the following:

> 5. Venue lies in the Central District of California, because the actions giving rise in this Complaint occurred in this district and [Northrop Grumman] *performs extensive business* in the area.
> 6. Plaintiff is an individual who is currently a citizen of the State of Colorado and a resident of Douglas County, Colorado. During many of the events at issue in this Complaint, he was a resident of Los Angeles County, California. [ . . . ]
> 7. [Northrop Grumman], at all times relevant, was a company with its headquarters in Falls Church, Virginia.

*Id.* ¶¶ 5–7 (emphasis added).

Sprinkled throughout the Complaint are a handful of other allegations, connecting the events of the case to Redondo Beach, California. *See id.* ¶¶ 19–20, 31 (discussing Sheets's employment at the Redondo Beach office and his discussions with the Northrop Grumman human resources employees at the Redondo Beach office). The only other allegations indicating that Northrop Grumman may be linked to California are found in the Sheets Decl. ¶¶ 10, 17, which support the same facts as those raised in the Complaint. The Motion solely addresses subject matter jurisdiction and does not provide any additional clarity as to either defendant. Mot. at 9.

Regardless, as the Complaint lacks the "short and plain statement" required by Rule 8(a)(1), the Court finds that Sheets has not met his burden. *See Mattel, Inc.*, 354 F.3d at 862. As a result, the Court is unable to determine whether the Northrop Grumman Defendants are subject to personal jurisdiction in this forum. As the Court may not grant a Motion for Default Judgment where it has not been established that the defendants are subject to personal jurisdiction in this forum, the Court hereby DENIES the instant Motion.

## V. Conclusion

For the reasons stated above, the Motion for Default Judgment is DENIED without prejudice. It appears that it may be possible for Sheets to amend the Complaint and address the defects identified above. *Brown v. Stored Value Cards, Inc.*, 953 F.3d 567, 574 (9th Cir. 2020) (stating that leave to amend is to be "granted with extreme liberality."). As such, Sheets is granted leave to amend the Complaint in compliance with the Federal Rules of Civil Procedure and submit a renewed Motion for Default Judgment.

**IT IS SO ORDERED.**

Dated: March 31, 2023

_____

MAAME EWUSI-MENSAH FRIMPONG

United States District Judge